UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Virginia Harper,**

    **Plaintiff,**

    v.

**Officer W.F. Amweg,** *et al.***,**

    **Defendants.**

**Case No. C2-04-021**
**JUDGE SMITH**
**Magistrate Judge Kemp**

## OPINION AND ORDER

Plaintiff Virginia Harper asserts federal claims under 42 U.S.C. § 1983 for violations of her Fourth and Fourteenth Amendment rights. Specifically, Plaintiff contends that Defendants Officer W.F. Amweg and Deputy Hamburger lacked probable cause to arrest her for criminal trespass and peddler permit violation, conducted an unlawful search and seizure of Plaintiff, and used excessive force during Plaintiff's arrest. Defendant Amweg and Defendant Hamburger each move this Court for summary judgment on all claims against them. (Docs. 27-28). Plaintiff has filed Motions for Partial Summary Judgment on unlawful arrest and prosecution for "criminal trespass" and peddler permit violation. (Docs. 29-30). Each party has filed responses and replies to each motion and all the motions are now ripe for review. For the following reasons, the Court GRANTS Defendants' Motions for Summary Judgment and DENIES Plaintiff's Motions for Partial Summary Judgment.

## I. FACTS

The Plaintiff, Mrs. Virginia Harper, is a resident of Ostrander, Ohio and a supporter of The Ohio State University. Mrs. Harper and her family reside on property that contains buckeye trees. Considering the buckeye trees generate numerous buckeye nuts, the family began making

buckeye necklaces. Many family members became involved and in fact a family business, The Buckeye Tree, was started in 1999. In addition to necklaces, the family members create earrings, key chains, chokers, zip pulls, and bracelets. The Buckeye Tree sells its products at Ohio State sporting events and to local retail stores such as the Buckeye Corner, Conrads, and the Buckeye Room.

     Mrs. Harper and her family sold their buckeye products on Ohio State's campus until the 2003-04 football season without incident. At some point in 2003, a decision was made by officials in Ohio State's Trademark and Licensing Department to prohibit individuals from selling homemade buckeye necklaces on University property. The Trademark and Licensing Office then hired a group of people to serve as "Vendor Detail." This group of individuals was comprised of local law enforcement and other officials associated with the University. The primary purpose of Vendor Detail was to look for people who are using the registered trademarks of The Ohio State University without paying a licensing fee. While the buckeye necklaces do not involve any trademarked material, the job to crack down on these necklace makers was also assigned to Vendor Detail. The Vendor Detail was instructed to order the sellers of these necklaces to leave campus.

     Beginning with the 2003 football season, the Harper family soon learned that they could not sell buckeye necklaces on campus. On September 13, 2003, Mrs. Harper, who was selling buckeye necklaces on the sidewalk adjacent to Woody Hayes Drive, west of the Olentangy River, was approached by an undercover officer. Mrs. Harper now knows this officer to be Defendant Amweg. Defendant Amweg told Mrs. Harper that she could not sell buckeye necklaces on Ohio State's property. Mrs. Harper asked where she might go to sell her necklaces

and Defendant Amweg told her to go to Lane Avenue if she wanted to sell anything. Mrs. Harper was cooperative with the officer and she took her necklaces and left Ohio State's property immediately. Defendants never saw her anywhere else on campus that day, nor were there any reports giving Defendants any reason to believe that she disobeyed them.

On September 27, 2003, Mrs. Harper returned to the Ohio State area to sell the buckeye necklaces. Mrs. Harper paid to park at the Buckeye Lot North, adjacent to Ackerman Road. Mrs. Harper then walked to the intersection of Lane Avenue and Olentangy River Road. Mrs. Harper believed she was in compliance with the officers' orders, that she was not on Ohio State's campus. In fact, Mrs. Harper noticed that other people were selling homemade products in the same area. Mrs. Harper was only there for a short time before the Defendants approached her. The Defendants informed her that she was on University property again. Mrs. Harper told Defendants that she believed she was complying with their instruction and Defendants agree that it was an honest mistake.

Mrs. Harper then packed up her things and left immediately. Mrs. Harper began the long walk back to where she parked. During the walk back to her car, Mrs. Harper did not stop or begin to sell necklaces. However, shortly before reaching her car, a woman and her two daughters approached Mrs. Harper and held out $10.00 and said she would like to buy two necklaces. Mrs. Harper made the quick exchange and continued walking to her car.

Mrs. Harper, however, did not reach her car as Defendants caught up with her and grabbed her from behind without warning. Mrs. Harper claims she was jerked around by Defendant Amweg, and that she was frightened. Plaintiff claims this use of force was unnecessary and unjustified as she was always cooperative with Defendants. Mrs. Harper was

detained and her fanny pack and backpack were searched. Mrs. Harper tried to explain to the officers that she was going home. In fact Defendant Amweg stated "[s]he made some comments about she was going home...she was trying to explain to me that she was not selling, she was going home." (Amweg Depo. at 93).

The Defendants then arrested Mrs. Harper, handcuffed her, and took her to the Ohio State police station where she was booked and processed. Mrs. Harper claims the handcuffs were very tight and caused her significant pain while wearing them and even after they were removed. When Mrs. Harper was arrested, the Defendants specifically told her that she was being arrested for selling more necklaces, not for failing to leave. Defendant Amweg stated: "As. ...I told her she was under arrest, the fact that we had seen her sell buckeye necklaces and we had told her not to do that...I was making sure that she understood that that's why I was arresting her at that time." (Amweg Depo. at 92).

Mrs. Harper was charged with two crimes: criminal trespass and selling without a peddlers permit. Ohio Revised Code § 2911.21 sets forth the elements of criminal trespass which Mrs. Harper was charged with:

> (A) No person, without privilege to do so, shall do any of the following:
> (3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access.
> (D) Whoever violates this section is guilty of criminal trespass, a misdemeanor of the fourth degree.

Mrs. Harper was also charged with Columbus City Code Chapter 523, selling without a peddlers permit. Columbus City Code § 523.02(a) provides: "no peddler shall operate in [Columbus] without first having procured from the license section, a valid "peddlers" license."

However, there is a specific exemption in the Columbus City Code for persons who sell their own handiwork.  Both of the charges brought against Mrs. Harper were later dismissed.

Mrs. Harper argues that Defendants lacked probable cause to arrest her for criminal trespass and the peddler permit violation, conducted an unlawful search and seizure of Plaintiff, and used excessive force during Plaintiff's arrest.  She asserts that Defendants actions were done within the scope of their employment, under color of state law, recklessly, wantonly, in bad faith, and/or maliciously.  Mrs. Harper claims that as a result of Defendants' actions, she has suffered and continues to suffer severe traumatic effects, including physical pain and suffering; other physical symptoms including insomnia, nervousness, and nightmares; extreme mental and emotional upset; fear; embarrassment; inconvenience; anguish; legal, medical, and other expenses.

## II.  SUMMARY JUDGMENT

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Matsushita Electric Industrial

5

Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).[1]  The Court disregards all evidence favorable to the moving party that the jury would not be not required to believe. Id.  Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. Id.

The Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for

---

[1] Reeves involved a motion judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, Reeves, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. In re Morris, 260 F.3d 654, 665 (6th Cir. 2001). As such, Reeves did not announce a new standard of review for summary judgment motions.

summary judgment.'" Id. (*quoting* Liberty Lobby, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" Id. (*quoting* Matsushita, 475 U.S. at 586).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).

### III. ANALYSIS

**A.    Qualified Immunity**

Defendants Amweg and Hamburger assert that they are entitled to qualified immunity from Plaintiff's claims against them. They assert that they did not violate any of Plaintiff's constitutionally protected rights and are therefore entitled to summary judgment on the issue of qualified immunity. Plaintiff asserts that the defense of qualified immunity does not protect Officer Amweg and Deputy Hamburger from liability.

Under the doctrine of qualified immunity, government officials performing discretionary functions are immune from suit unless the plaintiff shows the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Conn v. Gabbert, 525 U.S. 286, 290 (1999) (*quoting* Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of

liability.'" Elder v. Holloway, 510 U.S. 510, 514 (1994) (*quoting* Harlow, 457 U.S. at 806)).

The Court must apply a two-step test to determine whether qualified immunity protects a government official. Conn, 526 U.S. at 290; Buchanan v. City of Bolivar, 99 F.3d 1352, 1358 (6th Cir. 1996). The first step is to determine whether a violation of a clearly established constitutional right has occurred. Conn 526 U.S. at 290; Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir. 1996). If a constitutional violation is found, the second step is to determine whether an objectively reasonable public official in the circumstances would have recognized that his conduct violated the clearly established constitutional right. Conn, 526 U.S. at 290; Buchanan, 99 F.3d at 1358; Dickerson, 101 F.3d at 1158.

To be clearly established at the time of the conduct in question, the constitutional right must have been recognized by the U.S. Supreme Court, the United States Court of Appeals for the Sixth Circuit, this Court or other courts within the Sixth Circuit, or, in some cases, courts of other circuits. Sheets v. Moore, 97 F.3d 164, 166 (6th Cir. 1996); Dickerson, 101 F.3d at 1158. "The contours of the right must be sufficiently clear that a reasonable person would understand that what he is doing violates that right." Sheets, 97 F.3d at 166. "This is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." Id. (*quoting* Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

### 1. Clearly Established Constitutional Violation

Plaintiff, Mrs. Harper, argues that the Defendants violated her constitutional rights

because they lacked probable cause to arrest her for criminal trespass and the peddler permit violation, conducted an unlawful search and seizure of her person and her belongings, and used excessive force during her arrest.  The Court will therefore consider each of Plaintiff's claims to determine whether Defendants violated Plaintiff's clearly established constitutional rights in accordance with the first prong of the qualified immunity test.

      **a.**      **Probable cause to arrest Plaintiff**

The test for determining whether a police officer had probable cause to arrest is whether, at the time of the arrest, "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." Diamond v. Howd, 288 F.3d 932, 936 (6th Cir. 2002)(*citing* Beck v. Ohio, 379 U.S. 89, 91 (1964).  Another consideration is whether the "'factual and practical considerations of every day life' could lead a reasonable person to believe that there is a probability that an illegal act has occurred or is about to occur." United States v. Strickland, 144 F.3d 412, 416 (6th Cir. 1998)(*citing* Illinois v. Gates, 462 U.S. 213, 231 (1983)).

In making the decision whether to arrest, "[o]fficers are not required to rule out every possible explanation other than the suspect's illegal conduct before making an arrest." United States v. Reed, 220 F.3d 476, 478 (6th Cir. 2000).  A duty to investigate is not part of the probable cause determination. Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988).  Nor are officers required to "prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." Durruthy v. Pastor, 351 F.3d 1080, 1089 (11th Cir. 2003); *see also* Kelley v.

9

Myler, 149 F.3d 641, 646-47 (7th Cir. 1998)(refuses to add investigation to probable cause determination and grants qualified immunity to officers who arrested plaintiff for criminal trespass, even though plaintiff claimed to be and in fact was standing on a public right-of-way when she was arrested).

The facts leading up to the arrest are undisputed. Plaintiff was given more than adequate notice that she could not sell her buckeye necklaces on any Ohio State property. On September 13, 2003, Plaintiff was warned by Defendant Amweg that she could not sell her necklaces on University property. In fact, Plaintiff even admits that Amweg "told me that I was not allowed to sell my buckeye necklace on OSU property." (Pl. Dep. at 128). Two weeks later, on September 27, 2003, Plaintiff was again approached by Defendant Amweg and told that she could not sell her necklaces on Ohio State property.

Only after two warnings and then witnessing Plaintiff selling additional necklaces did Defendants arrest Plaintiff. Not only did Plaintiff admit that she was told she could not sell her necklaces on Ohio State property, but Plaintiff also admitted that she knew she was on Ohio State property when she sold the buckeye necklaces that resulted in her arrest. (Pl. Dep. at 165, 181-82). Despite the facts being what they are, Plaintiff argues that she was leaving the campus and therefore complying with the officers orders. It does not matter, however, what Plaintiff claims as the officers were "under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." Criss, 867 F.2d at 263.

In the case at bar, Defendants did not have any knowledge as to where Plaintiff had

10

parked her car, nor that she was leaving the campus area. But most importantly, Defendants did not have any duty to investigate Plaintiff's claims. Rather, Plaintiff continued to sell buckeye necklaces on Ohio State property despite direct orders not to do so. Based on Plaintiff's disregard for the law, Defendants had probable cause to arrest her for criminal trespass and therefore did not violate Plaintiff's constitutional rights.[2]

### b. Probable cause to search

In accordance with the Fourth Amendment "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," a police officer may, upon a lawful custodial arrest, conduct a warrantless search of the arrested individual, as well as the area immediately surrounding the individual. Chimel v. California, 395 U.S. 752, 752-63 (1969). The Chimel court reasoned that officer safety primarily justifies these searches. Id. at 763. An arrest is constitutional if "at the moment the arrest was made, the officers had probable cause to make it." United States v. Thomas, 11 F.3d 620, 627 (6th Cir. 1993).

The Court has previously determined that the arrest of Plaintiff in this case was lawful, as the officers had sufficient probable cause to arrest. Therefore, because the officers made a lawful arrest, they were justified in conducting a warrantless search of Plaintiff's person and her belongings.[3]

### c. Excessive Force

---

[2] An additional charge for not having a peddler's permit was also added after Plaintiff was taking to the police station. However, probable cause to arrest Plaintiff for any criminal offense is all that is required, not that the officers have probable cause for a specific offense. See Kelley, 149 F.3d at 648.

[3] Plaintiff even concedes that if the arrest was "based upon probable cause, then cuffs and a search were permissible." Pl's Memo. Contra Def Amweg's Mot. for Summ. J. at 20.

11

Claims regarding police officers' use of excessive force in the course of an arrest or other seizure are governed by the Fourth Amendment. *See* Phelps v. Coy, 286 F.3d 295, 299 (6th Cir. 2002)(*citing* Graham v. Connor, 490 U.S. 386, 395 (1989)). The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *See* Graham, 490 U.S. at 396.  This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case. Id. at 396. "[R]easonableness must be evaluated from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." Id.  Courts evaluating the reasonableness of force used "should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  Darrah v. City of Oak Park, 255 F.3d 301, 307 (6th Cir. 2001)(*quoting* Graham, 490 U.S. at 396).

Plaintiff argues that Defendants physically held, moved, and handcuffed her.  She does concede, however that she was not physically injured, just that physical measures were taken. The only claim that could be construed as one for excessive force is that the handcuffs were too tight.

To establish a claim of excessive force based upon handcuffing, the arrestee must show that she "complained to the officers that the handcuffs were too tight;" and that, as a result, the arrestee incurred an injury.  Burchett v. Keifer, 310 F.3d 937, 939-40 (6th Cir. 2002).  The right to be free from "excessively forceful handcuffing" is a clearly established right for qualified immunity purposes.  Kostrzewa v. City of Troy, 247 F.3d 633, 641 (6th Cir. 2001),  However, in

this case, there is no evidence that Plaintiff complained to the officers, nor that she suffered any injury as a result of being handcuffed. Further, Plaintiff concedes that if the arrest was "based upon probable cause, then cuffs and a search were permissible." Pl's Memo. Contra Def Amweg's Mot. for Summ. J. at 20. The officers were justified in handcuffing Plaintiff as a result of the lawful arrest and to permit them to conduct a lawful search of her person and her belongings. Therefore, none of Plaintiff's clearly established constitutional rights were violated when she was handcuffed as a result of her arrest.

### 2. Clearly Established

If the Court were to have found that the Defendants violated any of Plaintiff's constitutional rights, then the next step would be to ask whether the right was "clearly established" in a particularized sense, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 201 (2001).

While the constitutional rights to not be arrested without probable cause, to not be subjected to unlawful search and seizure and the right to be free from excessive force may be clearly established rights, a reasonable officer in the same situation as either of the Defendants in this case would have recognized those rights. Just as the Defendants did in this case, a reasonable officer would not have arrested Plaintiff unless he had probable cause to do so. Considering that probable cause did exist to arrest Plaintiff for continuing to sell buckeye necklaces on Ohio State property after being told not to, there was not violation of Plaintiff's clearly established constitutional rights.

### 3. Objectively Reasonable Officer test

13

Even if the Court were to have found that Defendants did violate Plaintiff's clearly established constitutional rights, Plaintiff cannot establish that an objectively reasonable officer faced with the same circumstances as Defendants would have recognized that the conduct violated a clearly established constitutional right. The final test for qualified immunity is whether an objectively reasonable officer under the circumstances would have known that the officers' conduct violated the constitution in light of the preexisting law.

Considering the circumstances in this case, that Plaintiff was told on two separate occasions not to sell buckeye necklaces on Ohio State property and that the officers saw her making an additional sale on Ohio State property, an objective officer under the circumstances, who was trained in the laws of the City of Columbus and State of Ohio, would recognize that probable cause did exist to arrest Plaintiff. An objective officer, just like Defendants in this case, would have recognized that Plaintiff was still on Ohio State property and was selling necklaces despite being instructed not to and therefore had probable cause to arrest her for criminal trespass. Therefore, such an arrest was not a violation of Mrs. Harper's constitutional rights. Accordingly, Defendants Amweg and Hamburger are entitled to qualified immunity.

## IV.  DISPOSITION

For all of the foregoing reasons, the Court **GRANTS** Defendants' Motions for Summary Judgment and **DENIES** Plaintiff's Motions for Partial Summary Judgment.

The Clerk shall remove Docs. 27, 28, 29, and 30 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases.

**IT IS SO ORDERED.**

>/s/ George C. Smith
>**GEORGE C. SMITH, JUDGE**
>**UNITED STATES DISTRICT COURT**